IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TERRY LYNN STURDEVANT, JR.,<br><br>Defendant. | CR 16–11–H–CCL<br><br><br>OPINION & ORDER |

Before the Court is Defendant Terry Lynn Sturdevant, Jr.'s Motion to

Suppress Evidence and Statements (ECF No. 19) and the Magistrate Judge's

Findings and Recommendations ("F&R") (ECF No. 34) thereon.  The government

has filed the "United States Objections to the Court's February 7, 2017, Findings

and Recommendations."  (ECF No. 38.)   The parties argued the objections before

the undersigned on April 6, 2017, and the government submitted additional testimony in support of its objections.

Pursuant to 28 U.S.C. § 636(b)(1) this Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." The district judge must review the magistrate judge's findings and recommendations de novo if objection is made. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). If an objection is made, the court reviews de novo only the portion to which the objection was made, and the remainder is reviewed for clear error. *McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981). An objection having been made, this Court reviews the F&R accordingly.


BACKGROUND

Defendant Sturdevant is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. 922(g). The events in this case took place in Jefferson County, Montana, which the Court notes is a medium-sized, rural county

in Montana comprising approximately 1,659 square miles, and specifically the events took place in the town of Whitehall, which has a population of around 1,038 (2010 Census figure).

The testimony before the Magistrate Judge was that at 1:43 a.m., on Saturday, March 5, 2016, two Jefferson County Sheriff's deputies were assisting on a call in Elk Park, Montana, when their dispatcher requested that they respond forty miles away to the 911 call from a residence in Whitehall. Both officers were responsible for the southern half of Jefferson County, and due to the nature of the call they each drove the 40 miles to Whitehall, arriving 15 to 20 minutes later, at approximately 2:05 a.m. The call was placed by the mother whose three adult sons resided in her Whitehall home. The mother's 911 call was precipitated by two of the sons getting into a fight in the residence.

Prior to the officers' arrival in Whitehall, their dispatcher informed them that the mother called 911 because her two adult sons were fighting in her home with a knife. Dispatch called an ambulance to the scene, and the ambulance arrived before the sheriff's deputies. An EMT with the ambulance called the cell

phones of the officers while they were still en route and informed them that a knife

was involved in the fight and also a gun. The EMT also said that one of the sons,

Terry Lynn Sturdevant, had left the residence with the gun. The location of the

knife was as yet unknown.

*Officer Dan Haggerty's Testimony.* At 2:08 a.m., at Officer Korst's request,

dispatch also called an off-duty officer, Officer Dan Haggerty, who left his home

and drove to the Whitehall residence, arriving at approximately 2:30 a.m.

Dispatch explained that there had been a disturbance at the Whitehall residence

involving a gun and a knife and that the suspect had fled on foot. Officer

Haggerty had had prior dealings with Sturdevant, and he had been to this

Whitehall residence in the past on numerous occasions. (ECF No. 36[1]; TR 96:8-

10.) Officer Haggerty was also involved with a Child and Family Services

investigation relating to Sturdevant's 8-year-old son, who was living in the

residence and present during the fight. From his prior visits to the residence,

---

[1] Transcript of suppression hearing before Magistrate Judge.

Officer Haggerty knew that the family had "a lot of issues," and he considered some of the family members to be unstable. (ECF No. 36; TR 91:13-17.) (The victim's statement indicates that on a previous occasion, the Defendant had stabbed one of his brothers. (ECF No. 22-3; Gvt. Ex. 4, Statement of Adam Hoyt.)) Officer Haggerty thought that Sturdevant had three other adult brothers (Adam, Dustin, and Chris) there at the house (ECF No. 36; TR 96:18-24), but when Officer Haggerty arrived and saw Terry being taken into custody, Haggerty did not know where the other three brothers were located (ECF No. 36; TR 102:21-22). Upon his arrival, Officer Haggerty was told that neither the knife nor the gun had been found, so Officer Haggerty felt a "sense of urgency" (ECF No. 36; TR 101:8-14) because the scene was not secure (ECF No. 36; TR 100:7-13). Haggerty knew that an assault with deadly force had taken place and that the weapons involved had not been located, and he was concerned for the sake of everyone's safety–his own safety and that of the other officers, the safety of the other family members, and the safety of the public. (ECF No. 36; TR 97:13-16; 99:24-100:2; 101:8-14.) He was concerned about not knowing where the firearm

was dropped and who might pick it up.  (ECF No. 36; TR 100:1-2.)

*Officer Jason Korst's Testimony.*  When Officer Korst arrived at the Peterson residence, he briefly searched around the driveway of the house for the Defendant and then entered the house.  He photographed the interior of the house, where he found "a war zone."  "Everything in the kitchen was kind of in shambles. There was blood on the floor, the walls, the stove, the fridge, the table, the chairs, just scattered all through the kitchen area where there had been a struggle."  (ECF No. 36; TR 13:14-18.)  He took a statement from the alleged victim (an adult brother of the Defendant), but Defendant's mother stated that she would not give a statement against one of her sons.  (ECF No. 36; TR 21:4-8.)  Someone told Deputy Korst that Deputy Mercer had found the alleged assailant, Terry Sturdevant, in the backyard.  Deputy Korst immediately went out the backdoor of the residence to assist Deputy Mercer.  Even though they were taking Sturdevant into custody, Deputy Korst believed that an emergency still existed because the gun and the knife were still missing.  He believed the missing weapons posed a threat to anyone on the scene, including the residents of the house.  (ECF No. 36;

TR 36:24-37:3.)  Deputy Korst had no idea where Sturdevant had dropped the gun, but he knew that Sturdevant had left through the front door and could have run through the neighborhood.  Deputy Korst knew that there was a day care within a block of the residence and that newspaper delivery people would soon be out in the neighborhood to deliver papers.  He knew that an eight-year-old lived in the residence.  Deputy Korst felt that "[o]ur concern was the safety for everybody to find the weapons."  (ECF No. 36; TR 41:2-3.)  The area of concern was several blocks, and Deputy Korst felt that "[w]e just couldn't secure the area.  It is too big of an area."  (ECF No. 36; TR 41:8-9.)  Deputy Korst testified he could have slowed down and gotten a search warrant if he had known where the weapon was and could have secured it for safety.  (ECF No.36; TR 41:6-13.)  Without knowing where the weapon was or having any ability to put manpower on the weapon to secure it, Deputy Korst felt this was an emergency.  While Korst was escorting Sturdevant to the ambulance for treatment, Sturdevant told him that his brother, Adam, was the aggressor in the fight and that Adam was not taking his medication

and was unstable.  (ECF No. 44[2]; TR 15:8-15.)

*Officer Scott Mercer's Testimony.*  Officer Mercer, responding to the 911 call in his separate vehicle, did not go directly to the residence, but instead began driving around the neighborhood looking for the Defendant in a two- or three-block area.  Not finding Sturdevant, Officer Mercer drove to the residence and parked in the alley behind the residence, where he began looking for the Defendant.  He knew that the suspect was Terry Sturdevant and that Sturdevant reportedly had both a gun and a knife.  (ECF No. 36; TR 51:1.)  Deputy Mercer walked around the residence, staying outside of the fenced portion of the backyard, but eventually he was able to see Sturdevant laying face down inside of the wire fence, laying on the ground between a shed and a neighbor's privacy fence.  (ECF No. 36; TR 50:5-7.)  While assisting Officer Korst in taking Sturdevant into custody and immediately thereafter, Deputy Mercer kept looking for the gun.  He was concerned about the families living in the neighborhood and

---

[2] Transcript from objections hearing.

about the children living in the residence itself.  (ECF No. 36; TR 51:19-21.)  He was concerned that if the gun was just laying anywhere in the neighborhood, it could easily be picked up by someone.  (ECF No. 36; TR 51:21-23.)  It was a public safety issue, not knowing whether the gun was in the yard or in the neighborhood, and not knowing where the gun had been tossed or hidden.  (ECF No. 36; TR 52: 9-10.)

*Search for the Gun.*  When Officer Haggerty arrived, he could see that Officers Korst and Mercer were taking the suspect into custody, and he could see them escorting Sturdevant inside of the fenced yard.  Officer Haggerty met them at a gate and untied the cords and ropes that kept the gate closed.  Officer Mercer told Officer Haggerty that the knife and the firearm had not been found.  While the other two officers took Sturdevant to the ambulance for treatment of a non-life-threatening knife wound, Officer Haggerty entered the backyard and found the shed (shed #1) where Sturdevant had been found lying face down between the shed and the adjacent neighbor's tall, wooden, privacy fence.  With the other two officers tending to Sturdevant, Officer Haggerty then walked along the backyard

fence line with his flashlight, looking for the missing weapons. Sweeping his flashlight along the fence line as he walked, in a matter of a few minutes (ECF No. 36; TR 101:13-14) he saw the firearm in plain view about one foot on the other side of the pig-wire fence. The .22 revolver's hammer was still cocked, and the handgun lay between the pig-wire fence and a second shed (shed #2) that stood just outside of the fence but still on the residential property. The distance between the point where Sturdevant was found in the fenced backyard to the point where shed #2 was located (outside of the fenced backyard) was approximately 75 feet.

Thus, a few minutes after Officer Haggerty opened the gate, but about 10 minutes after Sturdevant was discovered, Officer Haggerty yelled to Officers Mercer and Korst that he had found the firearm. Officers Mercer and Korst responded to Haggerty's shout and took photographs and secured the handgun, leaving Sturdevant cuffed to a cot in the ambulance under the supervision of the ambulance attendant and EMT.

*Testimony regarding search warrants.* Officer Korst testified that obtaining a search warrant would have taken many hours. Apparently the state district judge

was located in Madison County, and it would have taken an hour to take a search

warrant application to the judge and an hour to drive back to the scene.  (ECF No.

44; TR 14:11-14).  At a minimum, a search warrant application would have taken

four to six hours.  (ECF No. 44; TR 14:21-25.)  Officer Korst also testified that the

state district judge with jurisdiction over Jefferson County and Madison County

did not accept telephone search warrant applications.  (ECF No. 44; TR 14:15-20.)

Officer Mercer also testified that they could not get a search warrant by telephone

and that a paper application would have taken hours.  (ECF No. 44; TR 29:13-18.)


LEGAL STANDARD

The Magistrate Judge properly outlined the Fourth Amendment standards

that are applicable to the motion to suppress.  *See* ECF No. 34 at 3-4.  In addition,

the Magistrate Judge outlined the law applicable to the exigent circumstances

exception.  *See* ECF No. 34 at 11.  The Magistrate stated that

> "The law recognizes that in certain circumstances, 'the exigencies of
> the situation make the needs of law enforcement so compelling' that
> the Fourth Amendment's warrant requirement is lifted.  *Mincey v.*

11

*Arizona*, 437 U.S. 385 (1978).  These circumstances typically occur when the delay caused by seeking a warrant would lead to physical harm to the officers or members of the public, lead to destruction of valuable evidence, the escape of a suspect, or otherwise permanently frustrate law enforcement efforts.  *United States v. Furrow*, 229 F.3d 805 (9th Cir. 2000).  The mere presence of a gun does not create an exigent circumstance.  *United States v. Gooch*, 6 F.3d 673, 680 (9th Cir. 1993).  The government must show that there is a risk that the public will find the weapon because the area cannot be secured until police may obtain a warrant.  *Id.*

(ECF No. 34 at 11.)

As the government points out, "government agents may conduct a

warrantless search if (1) probable cause supports the search or seizure and (2)

exigent circumstances exist.  *United States v. Brooks*, 367 F.3d 1128, 1133 (9th

Cir. 2004)."  ECF No. 38, Gvt's Objection at 8-9.  The standard in the Ninth

Circuit defines exigent circumstances

as those that 'would cause a reasonable person to believe that [the search] . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.  *United States v. Furrow*, 229 F.3d 805, 812 (9th Cir. 2000) (internal quotations omitted), overruled on other grounds by *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001).

'[A]n analysis of probable cause in exigency cases must be applied

> by reference to the circumstances then confronting the officer,
> including the need for prompt assessment of sometimes ambiguous
> information concerning potentially serious consequences. *Murdock v.
> Stout*, 54 F.3d 1437, 1441 (9th Cir. 1995) (quoting Wayne R. LaFave,
> Search and Seizure: A Treatise on the Fourth amendment § 6.6(a) (2d
> ed. 1987) (quotation marks omitted)).

ECF No. 38 Gvt's Objection at 9. Furthermore, the government asserts that the U.S. Supreme Court has affirmed that law enforcement must not leave guns where members of the public might find them. *New York v. Quarles*, 467 U.S. 649, 656-68 (1984) (holding that questioning suspect regarding where he dropped gun is excepted from *Miranda* requirements).


DISCUSSION

The government objects to the finding that no exigent circumstance existed that would have eliminated the warrant requirement. This finding is based on the conclusion that the officers could have secured the property by posting a guard, as was done in *Gooch*, and thereby prevented the public or a family member from entering the property while the officers obtained a warrant.

However, this finding is flawed because it is based upon an assumption that the officers knew that the gun was on the property, which they did not know. Not only that, the property was relatively large and only partially fenced and contained several large trees and two sheds that block sight-lines across the property. In other words, to properly secure the property would have probably required more officers than the three that were then on the scene. Each officer was worried that the gun had been dropped somewhere in the surrounding neighborhood and that they would need to search the neighborhood before the newspaper deliveries started and before children began playing in their yards. Thus, they only *hoped* they would find the gun somewhere on the property, but they knew they would have to search the entire neighborhood if they could not find the gun on the property.

Searching a limited space before necessarily expanding the search for the gun to the neighborhood is supported by the exigent circumstances exception. *See United States v. Ware*, 914 F.2d 997, 1000-01 (7th Cir. 1990) (exigent circumstances permitted officer to search in car for gun because it was either in the

car or had been discarded by the defendant, and the duty of law enforcement is to keep the gun from untrained or malicious hands).

In *Gooch*, the officers knew that a gun was in a tent, the occupants had exited the tent, and the officers were able to post a guard at the tent to prevent the public from picking up the gun while a search warrant was obtained. The factual circumstances were very different in the instant case. In this case, the gun was probably somewhere in a three-block radius, and the officers had no idea where the gun was located. No guard could be posted on the gun to keep it secure and safe.

In addition, there were some genuine officer safety issues that concerned the officers. Officer Haggerty had been to this residence multiple times in the past and believed that some of the family members were unstable (a belief that was at least underscored by the domestic violence earlier in the evening). Also, there were apparently three or four adult male brothers living in the residence, and the officers did not know where all the men were while they were taking one of the brothers into custody on the property. From an officer safety perspective, this was

an inherently dangerous situation. To add a missing handgun, perhaps somewhere on the property, added another layer of danger to officer safety. The officers could not consider the scene secure until the firearm was retrieved, and this Court agrees with that assessment.

Officer Haggerty's decision to begin looking for the gun where the suspect was found and spending a few minutes sweeping his flashlight along a fence line for a missing handgun is a perfectly reasonable alternative to having one officer obtain a warrant while the other two officers sit and wait at an unsafe domestic violence scene with an unknown number of family members either on the property or potentially arriving at the property, any one of whom might have found the missing handgun and used it against the officers.

Moreover, the officer safety issue was not the only exigent circumstance. There was also the public safety issue. The officers did have a duty to find the gun before someone in the neighborhood found it. Conducting a limited search of the property before beginning an expanded search of the neighborhood was only logical.

Two of the three officers had the responsibility for answering all the sheriff's calls from hundreds of square miles of Jefferson County at the same time that they were taking Sturdevant into custody and securing the scene by finding the gun before someone else did. It is not as though they had the resources of an entire metropolitan law enforcement agency to provide additional support. The third officer was an off-duty officer who left his home at 2:00 a.m. to provide assistance. No telephone warrant was available, and a paper application would have taken four to six hours. The three officers hoped they could find the gun quickly, for their own safety and for the safety of the public. Fortunately, the gun was found within a few minutes, making a full neighborhood search unnecessary.

As an aside, the Court notes that after the property owner invited the officers onto her property to quell the mayhem, there never was an objection to the scope of law enforcement activities until after the filing of the pending charge against Defendant Sturdevant for felon in possession of a handgun. The record before the Magistrate Judge also contains the written statement signed by Defendant's brother concerning the melee. I note it states in part,

I did not see how Terry got the knife but Terry started slicing at my face.  I knocked the knife out of his hand and we went to the ground, wrestled around, and Terry stabbed me in the leg with the knife.  Joey was trying to pull Terry away and trying to calm everyone down.  . . . Terry went and got a gun from someplace and pointed it at me.  I told Terry to pull the trigger and that I wasn't afraid of death. . . .  All I could think about was the gun and wondered if it was loaded or not. . . .

(*See* ECF No. 22-3; Gvt.'s Exhibit 4, Voluntary Statement of Adam Hoyt, attached hereto.)

The revolver, when, found, was not only loaded but fully cocked and ready to fire.  The law enforcement officers possibly averted a tragedy; they did well.

CONCLUSION

The Court finds and concludes that Officer Haggerty's search of the backyard fence line located 75 feet away from where the suspect was discovered was within the usual, normal, and lawful law enforcement response under all the existing circumstances; that it was reasonable to prevent physical harm to the officers and the public; and also that the exigent circumstances exception to the

Fourth Amendment warrant requirement applies.

Accordingly, the government's objection is sustained, and

IT IS HEREBY ORDERED that the Motion to Suppress Evidence and Statements (Doc. 19) is DENIED.

IT IS FURTHER ORDERED that this case is hereby set down for jury trial on Monday, May 22, 2017, at 9:30 a.m., in Courtroom II, United States Courthouse, 901 Front Street, Helena, Montana, before the undersigned sitting with a jury.

Any plea agreement shall be <u>received</u> in the Clerk's Office at <u>Helena</u> by May 8, 2017, at 12:00 noon. Motions for enlargement of time in which to file a plea agreement shall be received in <u>Helena</u> no later than May 8, 2017. In the absence of a motion to extend the plea agreement deadline and except for good cause shown, no plea agreement will be considered by the court thereafter.

Any party seeking a continuance of the trial date shall file a motion to continue in the <u>Helena</u> Clerk's Office on or before May 8, 2017.

In the absence of a signed Plea Agreement or a motion to continue the trial

date by May 8, 2017, the Clerk will order a jury on May 9, 2018.  Late filing of motions to continue or plea agreements may result in assessment of costs or imposition of other sanctions against parties and/or counsel.

Proposed voir dire questions and proposed jury instructions shall be on file with the Clerk of Court in <u>Helena</u> by May 12, 2017.

To aid and assist the court in preparing for trial and in trying the case,

IT IS FURTHER ORDERED that the Government shall submit to the Court on or before May 12, 2017, a trial brief and a trial notebook containing:

(a) a short summary of the nature and substance of the testimony of the witness;

(b) a list of all the exhibits to be used with that particular witness;

(c) a list containing a description of each exhibit to be used with each witness;

(d) a photocopy of each exhibit (when possible) to be used with each witness.

The trial brief shall include legal authority as to the Government's position on all

legal issues and evidentiary rulings and any anticipated objections thereto.

Counsel for defendant may, but is not required to, submit to the Court a similar trial brief from Defendant's perspective.

To enable the Court to operate in the most efficient manner possible, it is essential that this schedule be strictly adhered to by the parties.

Dated this 25th day of April, 2017.


CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE